IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VYGON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| RYMED TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Vygon, by its attorneys, as and for its Complaint herein against Defendant RyMed Technologies, Inc., alleges as follows:

### NATURE OF THE LAWSUIT

1.      By these claims, Vygon seeks to redress RyMed Technologies, Inc.'s ("RyMed" or "Defendant") infringement of Vygon's patent rights.  In particular, and as described below, RyMed has unlawfully used Vygon's patented invention in certain of its intravenous catheter care management products, all in violation of Vygon's rights.

### THE PARTIES

2.      Vygon is a corporation duly organized under the laws of France, having principal places of business at 5-11, rue Adeline, 95440 Ecouen, France and at its United States headquarters, located at 2495 General Armistead Ave, Norristown, Pennsylvania.  Vygon specializes in the design, development, manufacture and marketing of medical devices in the field of intravenous connectors.

3.     Defendant RyMed is a corporation duly organized and existing under the laws of the state of Delaware, having a principal place of business at 137 Third Avenue North, Franklin, Tennessee. Upon information and belief, RyMed manufactures, advertises, develops, markets, offers for sale and sells products in the field of intravenous catheter care management.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

5.     Upon information and belief, this Court has personal jurisdiction over RyMed because Rymed has at least minimum contacts with the forum. Upon information and belief, RyMed is incorporated in this judicial district, and manufactures, designs and/or develops products that are and have been used, marketed, offered for sale, sold and purchased in this judicial district, including the marketing and sale of products that infringe Vygon's patent rights. Accordingly, RyMed has purposefully availed itself of the privileges and benefits of the laws of the state of Delaware, and this Court's exercise of personal jurisdiction over RyMed would not offend traditional notions of fair play and substantial justice.

6.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) because, upon information and belief, RyMed resides in this District and/or is subject to personal jurisdiction in this District and thus may be found in this District.

## RYMED'S INFRINGEMENT OF VYGON'S PATENT

7.      On January 10, 1995, the United States Patent and Trademark Office duly and legally issued United States Patent No. 5,380,306 ("the '306 Patent") entitled "Unitary Composite Connector For A Liquid Circuit, In Particular For Medical Applications" to Dr. Thierry Brinon.  A true and correct copy of the '306 Patent is attached hereto as Exhibit A.

8.      The named inventor on the '306 Patent, Dr. Thierry Brinon, assigned his entire right, title and interest in the '306 Patent to Vygon, which is listed as the assignee on the '306 Patent.  A copy of the assignment is attached as Exhibit B to this Complaint.  Accordingly Vygon, as assignee, is the owner of the entire right, title and interest in and to the '306 Patent.

9.      Upon information and belief, RyMed has and continues to manufacture, use, advertise, market, design, offer for sale, and/or sell products, including medical apparatuses, that infringe the '306 Patent.  These products include, but are not limited to, RyMed's InVision-Plus® Neutral® IV Connector System and InVision-Plus® Neutral® with Modified Boot.

10.     On September 17, 2007, Vygon's counsel, in a letter to RyMed ("the September 17 Letter"), alleged that RyMed's InVision-Plus® NEUTRAL® I.V. Connector System and possibly other products, infringe the '306 Patent.  A true and correct copy of the September 17 Letter is attached hereto as Exhibit C.  Vygon requested that RyMed cease and desist its infringing activities with respect to the '306 Patent, including, without limitation, the manufacture, use offer for sale, and sale of RyMed's InVision-Plus® NEUTRAL® I.V. Connector System and all other infringing systems and components.  See Exhibit C.

DB02:6689684.1                                                                                              900001.0008

11.     RyMed responded to the September 17 Letter by letter dated October 3, 2007 to Vygon's counsel ("the October 3 Letter"), stating that it would not cease and desist from the alleged infringing activities set forth in the September 17 Letter. A true and correct copy of the October 3 Letter is attached hereto as Exhibit D.

12.     In an effort to resolve the dispute, the parties engaged in subsequent electronic mail correspondence and telephone communication until October 18, 2007 when Vygon, based on RyMed's refusal to cease its infringing activities, terminated such communications by electronic mail dated October 18, 2007. True and correct copies of certain of such correspondence, specifically, an October 16, 2007 e-mail from RyMed's counsel to Vygon's counsel and an October 18, 2007 e-mail from Vygon's counsel in response, are attached hereto as Exhibit E to this Complaint.

13.     On October 31, 2007, RyMed filed a civil complaint in the United States District Court for the Middle District of Tennessee, Nashville Division (07-CV-1077) against Vygon's subsidiary, Laboratoires Pharmaceutiques Vygon ("LPV") for a declaratory judgment of non-infringement and invalidity of the '306 Patent (the "Tennessee Action"). A true and correct copy of the Tennessee Action is attached hereto as Exhibit F. RyMed and Vygon stipulated to extend the time to respond to the Tennessee Action to March 31, 2008.

14.     LPV has no right, title or interest in the '306 Patent because Vygon is the owner of such patent. Accordingly, LPV is not a proper party to the Tennessee Action. Vygon intends to promptly move to dismiss that action.

-4-

## COUNT ONE

## RYMED'S INFRINGEMENT OF VYGON'S PATENT

15.     Vygon realleges and incorporates herein by reference the matters alleged in paragraphs 1-14 of this Complaint.

16.     In violation of Vygon's exclusive rights under the patent laws of the United States, 35 U.S.C.§ 261, et seq., RyMed has infringed and continues to infringe the '306 Patent by using, making, offering for sale, and selling products that embody the invention described and shown in the '306 Patent, including without limitation, the InVision-Plus® NEUTRAL® I.V. Connector System and InVision-Plus® Neutral® with Modified Boot.  Upon information and belief, RyMed also has contributed to and induced infringement of the '306 Patent, and continues all such infringing activities.

17.     Upon information and belief, RyMed's infringement of the '306 Patent has been and continues to be willful and deliberate.

18.     As a direct and proximate consequence of RyMed's infringing activities and practices, Vygon has suffered, and will continue to suffer, substantial damages, in an amount to be proven at trial, for which it is entitled to relief under 35 U.S.C. § 284.

19.     RyMed's conduct also has caused, and will continue to cause Vygon irreparable harm, for which there is no adequate remedy at law and for which Vygon is entitled to injunctive relief under 35 U.S.C. § 283.  RyMed's infringing conduct is likely to continue unless it is enjoined from such conduct by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, as a result of the unlawful and infringing acts of RyMed as set forth herein, Vygon prays for the entry of judgment from this Court:

A.    Declaring that Vygon is the owner of the '306 Patent and that the '306 Patent was duly and legally issued, is valid, and is enforceable;

B.    Declaring that RyMed has directly infringed, contributorily infringed, and/or induced infringement and continues to so infringe, one or more of the claims of the '306 Patent;

C.    Declaring that RyMed has willfully infringed one or more of the claims of the '306 Patent;

D.    Preliminarily and permanently enjoining RyMed, and all persons in concert and participation with RyMed, including RyMed's subsidiaries, affiliates, successors, assigns, officers, employees and agents, pursuant to 35 U.S.C. § 283, from infringing, contributing to the infringement of, and inducing infringement of the '306 Patent, and specifically from directly or indirectly making, using, selling or offering for sale, any products or services embodying the invention of the '306 Patent during the life of the claims of the '306 Patent;

E.    Awarding damages to Vygon in an amount adequate to compensate Vygon for RyMed's infringement of the '306 Patent, including disgorgement of RyMed's profits and an accounting of all such profits or gains derived from RyMed's infringing activities and violations of law;

F.    Ordering RyMed to deliver to Vygon, for destruction at Vygon's option, all products that infringe the '306 Patent;

900001.0008

G.     Awarding to Vygon treble damages pursuant to 35 U.S.C. § 285 by reason of RyMed's infringement of the '306 Patent;

H.     Deeming this case to be an "exceptional" case within the meaning of 35 U.S.C. § 285, entitling Vygon to an award of its reasonable attorney's fees, expenses and costs, including an assessment of interest in this action; and

I.     Awarding such other and further relief as the Court may deem just and proper.


Dated: March 26, 2008                    YOUNG CONAWAY STARGATT
                                          & TAYLOR, LLP


                                         _____
                                         Josy W. Ingersoll (#1088)
                                         *jingersoll@ycst.com*
                                         John W. Shaw (#3362)
                                         *jshaw@ycst.com*
                                         Adam W. Poff (#3990)
                                         *apoff@ycst.com*
                                         The Brandywine Building
                                         1000 West Street, 17th Floor
                                         Wilmington, Delaware 19801
                                         (302) 571-6600

                                         *Attorneys for Plaintiff*


OF COUNSEL:

Maxim H. Waldbaum (MW-4615)
SCHIFF HARDIN LLP
900 Third Avenue
New York, New York  10022
(212) 753-5000

DB02:6689684.1                                                                              900001.0008

# EXHIBIT A

US005380306A

# United States Patent [19]

## Brinon

[11] Patent Number: 5,380,306

[45] Date of Patent: Jan. 10, 1995

[54] **UNITARY COMPOSITE CONNECTOR FOR A LIQUID CIRCUIT, IN PARTICULAR FOR MEDICAL APPLICATIONS**

[75] Inventor: **Thierry Brinon**, Ecouen, France

[73] Assignee: **Vygon**, Ecouen, France

[21] Appl. No.: **980,547**

[22] Filed: **Nov. 23, 1992**

[30] **Foreign Application Priority Data**

Nov. 25, 1991 [FR] France ............................... 91 14492

[51] Int. Cl.6 ............................................. A61M 5/00

[52] U.S. Cl. .................................. 604/244; 604/905; 128/764

[58] Field of Search .............. 604/905, 244, 245, 283, 604/256, 411, 414, 82, 83, 86–88, 200; 137/68.1; 251/199.6; 128/764, 766, 770

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,352,531 | 11/1967 | Kilmarx | 604/99 X |
| 3,399,677 | 9/1968 | Gould et al. | 604/99 |
| 4,781,702 | 11/1988 | Herrli | 604/244 |
| 4,893,636 | 1/1990 | Cook et al. | 128/764 |
| 4,920,976 | 5/1990 | Calzi et al. | 128/764 |
| 4,998,927 | 3/1991 | Vaillancourt | 604/283 |
| 5,065,783 | 11/1991 | Ogle | 137/68.1 |
| 5,092,840 | 3/1992 | Healy | 604/83 |
| 5,122,123 | 6/1992 | Vaillancourt | 604/192 |
| 5,127,904 | 7/1992 | Loo et al. | 604/83 |
| 5,154,703 | 10/1992 | Bonaldo | 604/244 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3809127 | 4/1989 | Germany | 604/283 |

*Primary Examiner*—C. Fred Rosenbaum
*Assistant Examiner*—V. Alexander
*Attorney, Agent, or Firm*—Mason, Kolehmainen, Rathburn & Wyss

[57] **ABSTRACT**

A hollow needle fixed in a chamber establishes a connection between an upstream coupling and a downstream coupling when it passes through a plug. The plug is made of a material such that it regains its closure properties when the needle is no longer passing through it, and it is pushed away from the needle by a spring to a closure position in which it fills the outlet opening of the downstream coupling. The connector is particularly suitable for use in medical applications.

21 Claims, 10 Drawing Sheets





FIG.1

Case 1:08-cv-00172-GMS    Document 1-2    Filed 03/26/2008    Page 4 of 35



<u>FIG.2</u>



<u>FIG.3</u>

U.S. Patent        Jan. 10, 1995      Sheet 3 of 10        5,380,306



FIG.4C

FIG.4B

FIG.4A



FIG.5



FIG.6



FIG.7          FIG.8          FIG.9

FIG.10          FIG.11          FIG.12



FIG.13







FIG. 14A                    FIG. 14B

Case 1:08-cv-00172-GMS    Document 1-2    Filed 03/26/2008    Page 8 of 35









2

2

14

14



FIG.16B





FIG.16A



FIG_17          16          FIG_18



FIG.19

18



5,380,306

1

## UNITARY COMPOSITE CONNECTOR FOR A LIQUID CIRCUIT, IN PARTICULAR FOR MEDICAL APPLICATIONS

The invention relates to a unitary composite connector for a liquid circuit, in particular for medical applications.

The term "unitary" means that the connector is constituted by a permanent assembly, unlike certain prior art connectors which are constituted by at least two separate subassemblies that are assembled together when the connection is established.

### BACKGROUND OF THE INVENTION

More particularly, the invention relates to a connector of the type that comprises a unitary composite connector for a liquid circuit, in particular for medical applications, the connector comprising: means constituting a tubular chamber between an upstream coupling and a downstream coupling situated at opposite ends of the chamber and fixed relative to each other, said upstream coupling constituting a passage; a hollow needle which is fixed in the chamber and which is suitable for causing the upstream coupling to communicate with the downstream coupling; and a plug suitable for being passed through by the needle, the plug being mounted in the passage of the downstream coupling so as to be capable of sliding between a downstream stable closure position where the plug closes said passage and where the needle does not pass through the plug, and an upstream position where said needle does pass through the plug and towards which the plug can be pushed by a member in said passage from outside said connector, and means situated in the chamber resiliently urging the plug towards its stable closure position, the material of the plug being such that the plug retrieves its closure properties when the needle is not passing through it.

Such a unitary composite connector is particularly useful in medical applications, for example when injecting a liquid into the body of a patient, and various embodiments have been described, in particular in Documents EP 0 309 771 and U.S. Pat. No. 4,998,927.

Those publications demonstrate that it is difficult to obtain a unitary composite connector of acceptable manufacturing costs that provide reliable and effective coupling and that is free from any danger of contamination.

An object of the invention is to provide a novel unitary composite connector of the above-described type, suitable for providing a coupling that is reliable and effective, that is of acceptable manufacturing cost, particularly if the connector is to be discarded after use, and that does not present any risk of contaminating the liquid circuit, in particular in the region of its downstream coupling.

### SUMMARY OF THE INVENTION

According to the invention this is achieved by said passage of the downstream coupling has an outlet opening that is completely filled by the material of the plug when the plug is in its stable closure position, thereby preventing any dead volume around the plug in the opening and thus preventing any risks of contamination relating to the presence of such a dead volume, and by said means resiliently urging the plug being a spring.

2

By using a spring to push back the plug where the prior art uses resilient deformation of a tubular portion of the plug itself is most important since it makes it possible to select the spring return force at will and to use a plug that is a force-fit in the downstream coupling such that the lateral compression of the plug in the coupling guarantees good sealing, the selected spring providing sufficient force to push the plug into the coupling in spite of the friction between the plug and the coupling due to the lateral compression of the plug.

### BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the invention are described by way of example with reference to the accompanying drawings, in which:

FIG. 1 is an exploded view of the component parts of a connector of the invention;

FIG. 2 is an axial section through the connector in its closed state;

FIG. 3 is an axial section through the connector in its non-closed state;

FIGS. 4A, 4B and 4C each is an axial section through a variant connector of the invention shown with the plug in three different positions;

FIGS. 5 and 6 are end views of the plug in the downstream coupling in two different embodiments;

FIGS. 7 to 12 are axial sections through different embodiments of the plug; and

FIG. 13 is a sectional view showing an embodiment of a connector in accordance with the invention;

FIGS. 14A and 14B are sectional views showing an embodiment of a connector in accordance with the invention with FIG. 14A showing the connector in a rest or no communication condition and FIG. 14B showing the connector in an operative or communication condition;

FIGS. 15A and 15B are sectional views showing an embodiment of a connector in accordance with the invention with FIG. 15A showing the connector in a rest or no communication condition and FIG. 15B showing the connector in an operative or communication condition;

FIGS. 16A and 16B are sectional views showing an embodiment of a connector in accordance with the invention with FIG. 16A showing the connector in a rest or no communication condition and FIG. 16B showing the connector in an operative or communication condition;

FIGS. 17–19 are sectional views showing embodiments of connectors in accordance with the invention; and

FIGS. 20A and 20B are sectional views showing an embodiment of a connector in accordance with the invention with FIG. 20A showing the connector in a rest or no communication condition and FIG. 20B showing the connector in an operative or communication condition.

### DETAILED DESCRIPTION

FIG. 1 shows the component parts of a first embodiment of a connector of the invention.

This connector comprises a rigid body constituted by a combination of five parts, namely:

a non-deformable case 1;
an upstream coupling 2;
a needle 3;
a closure plug 4; and
a helical spring 5.

5,380,306

3

These pieces are assembled together to constitute a unitary assembly (FIG. 2) taking account of the following features.

The case 1 delimits a tubular chamber 6 between a downstream end 7 which is shaped to constitute a downstream coupling, and an upstream end 8 which is shaped to receive the upstream coupling 2. In this example, the chamber 6 has two zones 6a and 6b of different diameters.

The upstream coupling 2 has a central channel 9 which receives the needle 3 as a friction fit, such that when said coupling is assembled to the case, the needle penetrates axially into the chamber, thus extending towards the downstream coupling.

The downstream coupling 7 constitutes a frustoconical passage 7b with the outlet opening 7a of said passage being slightly greater in diameter than its inlet opening 7c. This type of passage is designed in a manner that is known per se for receiving an endpiece 12 having a complementary male conical shape.

The plug 4, the chamber 6, and the passage 7b are shaped so that the plug can slide in the chamber and in the passage with lateral sealing between a downstream position (FIG. 2) and an upstream position (FIG. 3).

The plug is a cylindrical block of elastomer having a downstream end 4a suitable for sliding in the passage 7b with lateral sealing, and an upstream end 4b of larger diameter suitable for sliding in the chamber 6 with lateral sealing. Its upstream end is preceded by a tail 4c used for engaging The spring 5 which comes into abutment against the upstream end.

In the downstream position (FIG. 2) the needle penetrates into the plug, but the chamfered opening 10 of the needle remains buried in the plug with the plug material closing said opening. The plug thus constitutes a closure member since the needle does not pass right through it, and in this way it prevents communication between the upstream coupling and the downstream coupling.

In the upstream position (FIG. 3) the plug has moved back towards the needle so that the passage 7b of the downstream coupling is completely disengaged, and so that the chamfered opening of the needle has passed right through the plug, with the opening then projecting beyond the plug: in this position, the upstream coupling and the downstream coupling are put into communication with each other by the needle.

The spring 5 is housed in the chamber 6 between the upstream coupling 2 against which it bears and the plug 4 which it urges towards its downstream position in which the plug is abutment against a shoulder constituted by an internal annular rim 11 of the chamber.

The spring is chosen so as to allow the plug to move through a stroke sufficient for it to move back against the action of the spring into an appropriate upstream position.

This backwards movement may be caused by inserting an endpiece S into the conical passage of the downstream coupling, e.g. the end of a syringe (FIGS. 2 and 3).

The passage of the downstream coupling and of the endpiece are conical, respectively female and male, thereby enabling the endpiece to be held in the coupling by friction.

If the endpiece is removed, then the plug returns automatically to its closure position under drive from the spring. The material from which the plug is made is such that the plug recuperates its closure properties when the needle no longer passes through the plug.

4

Such materials are known for this purpose and do not require describing in detail.

In its closure position, the plug completely fills the outlet opening 7a of the conical passage in the downstream coupling, and advantageously the plug has an end that bulges out a little from said outlet opening of the coupling (FIG. 2).

This avoids any risk of contaminants entering the passage of the coupling when the plug is in its closure position.

The upstream coupling 2 is of any suitable type and is generally constituted by a male coupling.

FIG. 4 shows an embodiment in which the needle 3 is merely a tube having a non-chamfered end that is embedded in the plug material, with the plug 4 having a downstream end 4a that is provided with a longitudinal pre-perforation 4e such that when it is at rest (i.e. when said end is not engaged on the needle) the pre-perforation 4e closes up (FIG. 4a), whereas when the plug is pushed towards the needle by an external element, e.g. the end of the syringe S, thrust from the needle causes the pre-perforation to open progressively so as to allow the needle to pass therethrough in a manner that is known per se (FIGS. 4B and 4C).

The pre-perforation may have any desired shape. For example, its right cross-section may be in the form of a cross (FIG. 5) or of a point (FIG. 6).

The plug shown in FIG. 4 has a cylindrical end 4a of diameter greater than the diameter of the outlet opening 7a of the passage 7b, which diameter is greater than the inlet diameter 7c of said passage. As a result, the spring 5 must be selected to provide sufficient force to push the plug into its closure position (FIG. 4A) where it is a force-fit. The end of the plug is thus compressed laterally in the downstream coupling 7, thereby ensuring lateral sealing of the coupling.

FIGS. 7 to 9 show embodiments in which the plug has a front face 4d that is concave (FIG. 7), flat (FIG. 8) or convex (FIG. 9), and an end 4a that flares going away from its front face 4d. The flare of this end substantially matches the internal frustoconical shape of the downstream coupling 7.

FIGS. 10 to 12 show embodiments in which the plug has a front face 4d that is concave (FIG. 10), flat (FIG. 11), or convex (FIG. 12), but in which the end of the plug 4a is cylindrical.

These various embodiments all have particular advantages either with respect to ease of manufacture, or with respect to ease of disinfection, or else with respect to the quality of the sealing that is obtained. Thus, a convex front face (FIGS. 2, 4, 9, 12) facilitate forcing the plug into the passage of the downstream coupling under thrust from the spring, a concave front face (FIGS. 7, 10) provide better decontamination opportunities, a flared shape (FIGS. 7 to 9) reduces friction forces as the plug reaches the end of its stroke under thrust from the spring, i.e. at the moment when the force from the spring is at its smallest.

The invention is not limited to a particular choice of upstream and downstream couplings, said choice depending on the conditions in which the connector is to be used.

FIGS. 13 et seq. show non-limiting examples of connectors in accordance with the invention and provided with a variety of couplings. Some of the figures are in two parts showing respectively the connector when at rest (no communication) and in operation (communication).

5,380,306

5

In these embodiments:

the upstream coupling 2 is of the male Luer lock type (FIG. 13);

the connector is symmetrical and double-ended (FIG. 14): the chamber is split into two compartments, respectively a downstream compartment 6' and an upstream compartment 6'', the needle 3 is held in the chamber by a central support 13 through which it passes, and it has two opposite chamfered ends 10' and 10'' pointing respectively towards the downstream coupling 7 and towards the upstream coupling 2, and two moving plugs 4' and 4'' prevent communication respectively between the downstream compartment and the downstream coupling, and between the upstream compartment and the upstream coupling, each of the plugs being subjected to thrust from a corresponding spring 5', 5'' which bears against the central support 13 and which urges the corresponding plug towards a position in which it is in abutment and the needle does not pass through it. In FIG. 14A, the connector is shown at rest with both plugs being in the closure position, while FIG. 14B shows the connector having one end in operation, and its other end at rest;

the upstream coupling 2 is secured to a tube 14 (FIGS. 15A and 15B);

the upstream coupling 2 is secured to an endpiece 15 which constitutes a duct extending transversely relative to the needle 3 (FIGS. 16A and 16B);

the needle 3 passes right through the upstream coupling 2 (FIG. 17);

the needle passes right through the upstream coupling and receives an internal metal guide 16 (FIG. 18);

the upstream coupling 2 is secured to a flexible tubular duct 17 having one end in communication with the needle and having its opposite end provided with a coupling 18 (FIG. 19); and

the upstream coupling 2 constitutes a plug, e.g. a plug for a flask 19 (FIGS. 20A and 20B).

The terms "upstream" and "downstream" are used for designating the relative positions in the needle-to-plug direction. In operation, liquid will generally flow in the opposite direction such that if the liquid flow direction is taken as the reference, it becomes necessary to invert these terms: the "upstream" coupling should then be called the "downstream" coupling, the "outlet" opening of said coupling should then be considered as an "inlet" opening, etc.

The invention is not limited to the embodiments described above.

I claim:

1. A unitary composite connector for a liquid circuit, in particular for medical applications, the connector comprising:

means constituting a tubular chamber extending between an upstream coupling means extending from said chamber toward an upstream end of said connector and a downstream coupling means extending from said chamber toward a downstream outlet opening of said connector, said upstream coupling means including an upstream passage extending from said upstream end to said chamber and said downstream coupling means including a downstream passage extending from said chamber to said downstream outlet opening;

6

a hollow needle which is fixed in said upstream passage and which is disposed in said chamber for causing said upstream passage to be in fluid communication with said downstream passage; and

a plug being made of material that permits said needle to be passed through it and that recaptures its closure properties whenever said needle is not passing through it, said plug being mounted in said downstream passage so as to be capable of sliding between a downstream stable closure position where the plug closes said downstream passage, where said needle does not pass through said plug, and where said plug completely fills said downstream outlet opening so as to prevent any dead volume at said downstream outlet opening to thereby prevent bacteria from entering said downstream passage, and an upstream position where said needle does pass through said plug and towards which said plug can be pushed by a member inserted in said downstream passage from outside said connector through said downstream outlet opening, and spring means situated in said chamber resiliently urging said plug towards its downstream stable closure position.

2. A connector according to claim 1, wherein said plug is a force-fit in said downstream coupling means.

3. A connector according to claim 1, wherein the plug slides with lateral sealing in said downstream coupling means and in said chamber.

4. A connector according to claim 1, wherein the stable, closure position is defined by an abutment against which the plug bears.

5. A connector according to claim 1, wherein said spring is received in the chamber between an abutment which carries the needle and the plug, said spring urging the plug towards its downstream position where the plug is in abutment against a shoulder constituted by an inside annular rim in said downstream coupling means.

6. A connector according to claim 1, wherein the plug has a concave end.

7. A connector according to claim 1, wherein the plug has a convex end.

8. A connector according to claim 1, wherein said downstream passage of said downstream coupling means includes a conical shaped portion extending from said downstream outlet opening.

9. A connector according to claim 8, wherein said plug has a conical shape complementary to that of said conical shaped portion of said downstream passage.

10. A connector according to claim 1, wherein said needle includes a chamfered end.

11. A connector according to claim 1, wherein the portion of the plug through which the needle is to pass includes a longitudinal perforation.

12. A connector according to claim 1, wherein when the plug is in its closure position, the end of the needle is embedded in the material of the plug.

13. A connector according to claim 1, wherein the upstream coupling means is a male coupling.

14. A connector according to claim 1, wherein the chamber is divided into two compartments, respectively a downstream compartment and an upstream compartment, the needle is held in the chamber by a support and has two opposite chamfered ends respectively pointing towards the downstream coupling means and towards the upstream coupling, means and wherein two moving plugs close off communication

5,380,306

7

respectively between the downstream compartment
and the downstream coupling, means and between the
upstream compartment and the upstream coupling,
means each of said plugs being subjected to the action of
a spring which bears against the central support and
which pushes the plug towards a position where it is in
abutment and the needle does not pass therethrough.

15. A connector according to claim 1, wherein the
upstream coupling means is secured to a tube.

16. A connector according to claim 1, wherein the
upstream coupling means is secured to an endpiece
which constitutes a duct disposed transversely relative
to the needle.

17. A connector according to claim 1, wherein the
needle passes right through the upstream coupling
means.

18. A connector according to claim 1, wherein the
needle passes right through the upstream coupling
means and receives an internal metal guide.

19. A connector according to claim 1, wherein the
upstream coupling means is secured to a tubular flexible
duct having one communicating with the needle, and
having its opposite end provided with a coupling.

20. A connector for a liquid comprising:
   chamber means extending between an upstream cou-
   pling means and a downstream coupling means,

8

said downstream coupling means having an outlet
   opening at one end of said connector;
a hollow needle means disposed in said chamber
   means for coupling said upstream coupling means
   to said downstream coupling means;
a plug means through which said needle means can be
   moved, said plug means being made of a material
   that has closure properties when said needle is not
   passing through it;
spring means disposed in said chamber means for
   urging said plug means to a downstream closure
   position where said plug means closes said outlet
   opening of said downstream coupling means by
   completely filling said outlet opening such that
   when said needle means does not pass through said
   plug means said outlet opening is completely filled
   by said material of said plug to thereby prevent any
   dead volume in said downstream outlet opening
   and to thereby prevent bacteria from entering said
   connector through said downstream coupling
   means; and
activating means insertable in said downstream cou-
   pling means through said outlet opening for mov-
   ing said plug means towards an upstream open
   position where said needle means does pass
   through said plug means.

21. A connector according to claim 20 wherein said is
a helical spring.

* * * * *

# EXHIBIT B

## A S S I G N M E N T

(1) ......Thierry..BRINON.................................................

**(1-4)  Insert Name(s) of Inventor(s)**

(2) ..............................................................................

(3) .......................................................................... and

(4) ..............................................................................

In consideration of the sum of one dollar ($1.00), and other good and valuable considerations paid to each of the undersigned, the undersigned agree(s) to assign, transfer and set over to

**(5)  Insert Name of Assignee**

(5) ......VYGON..............................................................

**(6)  Insert Address of Assignee**

(6) of ..5-11 rue Adeline - 95440 ECOUEN / FRANCE................

(hereinafter the Assignee) the entire right, title and interest for the United States, its territories, dependencies and possessions, in the invention known as

**(7)  Insert Identification of Invention, such as Title, Case Number or Foreign Application Number**

(7) ......A..UNITARY..COMPOSITE..CONNECTOR..FOR..A..LIQUID..CIRCUIT,..IN PARTICULAR FOR MEDICAL APPLICATIONS .........Filed..on..November..23,..1992...Serial..Number..07/980,547

for which the undersigned has (have) executed an application for patent in the United States of America

**(8)  Insert Date of Signing of Application**

(8) on ..JANUARY..18,..1993.....................................................

1)  The undersigned agree(s) to execute all papers necessary in connection with this application and any continuing or divisional applications thereof and also to execute separate assignments in connection with such applications as the Assignee may deem necessary or expedient.

2)  The undersigned agree(s) to execute all papers necessary in connection with any interference which may be declared concerning this application or continuation or division thereof and to cooperate with the Assignee in every way possible in obtaining evidence and going forward with such interference.

3)  The undersigned agree(s) to execute all papers and documents and perform any act which may be necessary in connection with claims or provisions of the International Convention for Protection of Industrial Property or similar agreements.

4)  The undersigned agree(s) to perform all affirmative acts which may be necessary to obtain a grant of a valid United States patent to the Assignee.

5)  The undersigned hereby authorize(s) and request(s) the Commissioner of Patents to issue any and all Letters Patents of the United States resulting from said application or any division or divisions or continuing applications thereof to the said Assignee, as Assignee of the entire interest, and hereby covenants that he has (they have) full right to convey the entire interest herein assigned, and that he has (they have) not executed, and will not execute, any agreement in conflict herewith.

6)  The undersigned hereby grant(s) the firm of BURNS, DOANE, SWECKER & MATHIS, Alexandria, Virginia 22313 the power to insert on this assignment any further identification which may be necessary or desirable in order to comply with the rules of the United States Patent Office for recordation of this document.

In witness whereof, executed by the undersigned on the date(s) opposite the undersigned name(s).

Date .....JANUARY..23,..1993....... Name of Inventor ............................................ (SEAL)
Thierry BRINON

Date _____ Name of Inventor _____ (SEAL)

Date _____ Name of Inventor _____ (SEAL)

Date _____ Name of Inventor _____ (SEAL)

# EXHIBIT C

# LEVINE & MANDELBAUM

ATTORNEYS AT LAW
444 MADISON AVENUE
35TH FLOOR
NEW YORK, N.Y. 10022

ALAN H. LEVINE
alan.levine@levman.com

HOWARD F. MANDELBAUM
howard.mandelbaum@levman.com

INTELLECTUAL PROPERTY

TELEPHONE: 212-588-9800

FAX: 212-588-0780

email: mail@levman.com

September 17, 2007

BY CERTIFIED MAIL — RETURN RECEIPT REQUESTED

Dana William Ryan, President and CEO
Rymed Technologies, Inc.
137 3rd Avenue North
Franklin, TN 37064

Re:   U.S. Patent No. 5,380,306
      Brinon
      Unitary Composite Connector for a Liquid Circuit, in
      Particular for Medical Applications

Dear Mr. Ryan:

We are patent counsel to Vygon, assignee of the above referenced
Brinon patent, a copy of which is enclosed.

It has come to our client's attention that Rymed Technologies,
Inc. is infringing the Brinon patent by manufacturing, offering
for sale, and selling medical apparatus identified as the
"Invision-Plus Neutral Displacement I.V. Connector System", and
possibly other such apparatus, for use in performing intravenous
procedures.

Vygon requests that Rymed Technologies, Inc. provide written
assurance that it will cease and desist from all acts of
infringement of U.S. Patent No. 5,380,306 including, without
limitation, the manufacture, use, offer for sale, and sale of
Rymed's "Invision-Plus Neutral Displacement I.V. Connector
System" and all other infringing systems and components.

Mr. Dana William Ryan
Re: U.S. Patent No. 5,380,306
September 17, 2007
Page 2


Remedies for patent infringement in an action at law include an award of damages and an injunction. Infringing acts committed after the notice given by this correspondence will be willful and may result in an award of increased damages and attorneys fees.

Judicial intervention may be avoided if Rymed Technologies, Inc. demonstrates its good faith by responding, and voluntarily disclosing its gross sales of infringing devices and the profit derived from them for calculating mutually agreeable compensation, within ten business days from receipt of this letter.

Very truly yours,


Howard F. Mandelbaum


HFM/tpd
enc.

# EXHIBIT D

DAVID P. GORDON
ADMITTED IN CT & NY

DAVID S. JACOBSON
ADMITTED IN CT, NY & NJ

JAY P. SBROLLINI
ADMITTED IN NY & MA

OF COUNSEL:
THOMAS A. GALLAGHER
ADMITTED IN NY & NJ

# GORDON & JACOBSON, P.C.

INTELLECTUAL PROPERTY LAW

60 LONG RIDGE ROAD
SUITE 407
STAMFORD, CT 06902
PH: 203-323-1800
FAX: 203-323-1803
INFO@GORDONJACOBSON.COM

PATENTS

TRADEMARKS

COPYRIGHTS

LICENSING

COUNSELING

October 3, 2007

Howard B. Mandelbaum, Esq.
Levine & Mandelbaum
444 Madison Ave.                    Via e-mail: howard.mandelbaum@levman.com
35th Floor                          Via fax: 212-588-0780
New York, NY 10022

Dear Mr. Mandelbaum:

Re: Non-Infringement by RyMed Technologies Inc. of U.S. Patent #5,380,306 – Vygon

Please be advised that we represent RyMed Technologies, Inc. in intellectual property
matters. We are in receipt of your letter of Sept. 17, 2007 to Mr. Dana William Ryan,
President and CEO of RyMed which demands that RyMed cease and desist from the
manufacture, use, offer for sale, and sale of RyMed's InVision-Plus® Neutral®
Displacement IV Connector System.

At the outset, we wish to advise you that RyMed wishes to work with Vygon in an
amicable manner regarding Vygon's concerns. On the other hand, we wish to make it
extremely clear that RyMed will not cease its manufacture, sale, use or offer for sale of
its InVision-Plus® Neutral® IV Connector System. As we previously indicated by
phone and by e-mail, RyMed will consider acquiring the '306 patent from Vygon. In
addition, RyMed will be happy to consider other possible business arrangements; e.g.,
having Vygon become a distributor of the RyMed products in France. If Vygon wishes
to work amicably with RyMed, we are certain that there are suitable win-win
possibilities. However, if Vygon wishes to make unreasonable demands, we are certain
that not only will RyMed triumph, but that Vygon will end up spending considerable
resources for zero return.

It is our considered opinion that the RyMed InVision-Plus® Neutral® IV Connector
System does not infringe any claim of the '306 patent for numerous reasons, some of
which are set forth below. In fact, because of the sheer number of the limitations of each
of the independent claims of the '306 patent which are not practiced by RyMed's
product, we do not believe that reasonable due diligence was conducted prior to making a
claim of infringement.

More particularly, claim 1 includes *inter alia* the following limitations which are not
found in the RyMed device: 1) a hollow needle; 2) fixed in said upstream passage; 3) for
causing said upstream passage to be in fluid communication with said downstream
passage; and 4) spring means. As we have previously indicated, the RyMed device uses

GORDON & JACOBSON, P.C.
60 LONG RIDGE ROAD
STAMFORD, CT 06902

Page 2

a *spike* which has a closed tip and openings proximal the tip as opposed to a needle as shown and claimed in the '306 patent. Spikes and needles are well known in the medical arts to have different characteristics. In addition, the RyMed spike *is not fixed in any upstream passage*; rather, it starts downstream from the upstream coupling device. Further, because the tip of the spike is spaced upstream from the start of the downstream passage (as opposed to the tip of the needle of the '306 patent which terminates at the start of the downstream passage), *the spike cannot cause the upstream passage to be in fluid communication with the downstream passage*. Finally, the RyMed device does not use a spring as that term is defined in Col. 2 of the '306 patent, as *the RyMed boot valve specifically uses resilient deformation of a tubular portion of a plug* to push the plug – exactly what was effectively disclaimed in the '306 patent itself and the file history. Among other things that you apparently have failed to consider is that the boot valve of the RyMed product completely covers the spike and therefore functions as a plug exactly as shown in the prior art (e.g., Bonaldo, U.S. Patent #5,154,703).

We note that claim 20 is written in "means plus function" terminology. Thus, what is covered is only what is shown and described in the '306 patent and their equivalents. More particularly, claim 20 includes *inter alia* the following limitation which are not found in the RyMed device: 1) a hollow needle means; 2) for coupling said upstream coupling means to said downstream coupling means; 3) plug means; and 4) spring means. As set forth above with respect to claim 1, the RyMed device uses a *spike* which has a closed tip and openings proximal the tip as opposed to a needle as shown and claimed in the '306 patent. In addition the "needle means" of claim 20 is a separate element from the upstream coupling means and is fixed in the upstream passage, whereas *the spike is integrally molded with the upstream coupling means and is not fixed in the upstream passage*. These differences are not insubstantial as they significantly change manufacturing and affect flow characteristics. In addition, as set forth above with respect to claim 1, because the tip of the spike is spaced upstream from the start of the downstream passage (as opposed to the tip of the needle of the '306 patent which terminates at the start of the downstream passage), the spike cannot cause the upstream passage to be in fluid communication with the downstream passage. Further, the RyMed device does not have a "plug means" as shown and described in the '306 patent. In the '306 patent, the plug means is a unitary device with three cylindrical portions – a downstream end suitable for sliding in the downstream passage with lateral sealing, an upstream end of larger diameter suitable for sliding in the chamber with lateral sealing, and a tail used for extending inside and engaging a spring. If the septum of the RyMed device is considered the "plug means", *it is not shaped the same way and does not perform the same functions in the same way*. For example, the septum of RyMed does not have three cylindrical portions, the downstream end does not slide in the downstream passage with lateral sealing, the upstream end does not slide in the chamber with lateral sealing, and there is no tail which engages the inside of a spring. If the boot valve of the RyMed device is considered the "plug means", again none of the aspects of the claimed plug means apply. Even if the combination of the boot valve and septum are considered the "plug means", none of the aspects of the claimed plug means apply, and an additional

GORDON & JACOBSON, P.C.
60 LONG RIDGE ROAD
STAMFORD, CT 06902

Page 3

difference would be found in that the combination is not unitary as is the plug means of the '306 patent. Finally, as set forth above, the RyMed device does not use a spring means as that term is defined in Col. 2 of the '306 patent, as *the RyMed boot valve specifically uses resilient deformation of a tubular portion of a plug* to push the plug – exactly what was effectively disclaimed in the '306 patent itself and the file history.

In addition to the overwhelming case of non-infringement set forth above, we believe that you should be aware that the value of the '306 patent is significantly affected due to the failure of the applicant to cite relevant prior art which was cited in the French priority application, and because of additional prior art which was never considered by the Examiner. In particular, we note that the French priority application cited in its text certain prior art which was deleted from the U.S. application and which was never brought to the attention of the Examiner. In fact, no IDS was ever filed by the applicant, although one must assume that an accomplished company such as Vygon was aware of relevant art including the art cited in the French priority application. In addition, various extremely relevant prior art references were never considered by the Examiner. By way of example, U.S. Patent #5,242,432 to DeFrank which was filed prior to the French priority date of the '306 patent discloses in separate alternate embodiments a one piece valve (see e.g., Fig. 3) with accordion-type walls and a downstream plug which seals a downstream opening, and a two piece valve (see, e.g., Fig. 12) with a separate spring and a separate downstream plug which seals a downstream opening. In our opinion, even under pre-KSR law, and certainly since the recent KSR ruling, the DeFrank patent, and other patents of which we are aware, significantly impact the value of the '306 patent.

Given the above, RyMed believes that it would be reckless of Vygon to pursue a patent infringement action against RyMed's InVision-Plus® Neutral® IV Connector System. Such an action instituted after this correspondence might be considered in violation of Rule 11 and subject both you and Vygon to sanctions and responsibility for RyMed's attorneys fees. At a minimum, such an action would result in Vygon spending millions of dollars without any likelihood of success. Thus, RyMed respectfully requests that within ten days after receipt of this letter, Vygon officially withdraw in writing its "cease and desist" letter of Sept. 17, 2007.

At the same time, RyMed is willing to work with Vygon in an amicable manner. RyMed has opened the door to at least two win-win possibilities, and requests that Vygon respond in kind.

Very truly yours,

David P. Gordon

Cc: Mr. Dana Wm. Ryan, President, RyMed Technologies, Inc.

# EXHIBIT E

| | |
|---|---|
| **From:** | howard.mandelbaum@levman.com |
| **To:** | "David Gordon"; |
| **Subject:** | RE: Vygon - RyMed |
| **Date:** | Thursday, October 18, 2007 12:19:00 PM |

Dear Mr. Gordon,

Vygon stands by its demand that Rymed cease and desist from its acts of patent infringement. Vygon does not wish to pursue a business arrangement with Rymed or deal with Rymed other than through counsel.

Very truly yours,

Howard F. Mandelbaum
Levine & Mandelbaum
444 Madison Avenue - 35th Floor
New York, NY 10022
Phone: (212) 588-9800
Fax: (212) 588-0780
howard.mandelbaum@levman.com


-----Original Message-----
From: David Gordon [mailto:davidg@gordonjacobson.com]
Sent: Tuesday, October 16, 2007 9:55 AM
To: howard.mandelbaum@levman.com
Subject: Re: Vygon - RyMed


Dear Mr. Mandelbaum,

This is a follow-up to our previous correspondences and telephone calls.
We have noted that RyMed wishes to work with Vygon in an amicable manner and has proposed certain win-win possibilities.  We have also requested a business contact at Vygon so that Mr. Ryan can make contact and discuss mutually beneficial arrangements.
If Vygon has closed its file in this matter and does not wish to pursue mutually beneficial arrangements, please advise.  Otherwise, we would appreciate hearing back from you with the contact information.

Very truly yours,

David P. Gordon

--
David P. Gordon
Gordon & Jacobson, P.C.
Suite 407
60 Long Ridge Road
Stamford, CT 06902
davidg@gordonjacobson.com
http://www.gordonjacobson.com
Tel: (203) 323-1800
Fax: (203) 323-1803

_____

Gordon & Jacobson, P.C.
info@gordonjacobson.com

This electronic message transmission contains information from Gordon &
Jacobson, P.C. which may be confidential or privileged.  The information is
intended to be for the use of the individual or entity named above.  If you
are not the intended recipient, be aware that any disclosure, copying,
distribution or use of the contents of this information is prohibited.  If
you have received this electronic transmission in error, please notify us by
telephone (203-323-1800) or by reply via electronic mail immediately.

>
>
>
>

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **RYMED TECHNOLOGIES, INC.** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.** |
| | ) | |
| **v.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **LABORATOIRES** | ) | |
| **PHARMACEUTIQUES VYGON,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

### COMPLAINT FOR DECLARATORY JUDGMENT REGARDING NON-INFRINGEMENT AND INVALIDITY OF U.S. PATENT NO. 5,380,306

Plaintiff RYMED TECHNOLOGIES, INC. ("RyMed") alleges:

### PARTIES

1.      Plaintiff RyMed is a corporation duly organized and existing under the laws of Delaware, having a principal place of business at 137 Third Avenue North, Franklin, Tennessee.

2.      Upon information and belief, Defendant Laboratoires Pharmaceutiques Vygon ("Vygon") is a corporation duly organized under the laws of France, having a principal place of business at 5-11, rue Adeline, 95440 Ecouen, France.

### JURISDICTION

3.      This is an action arising under the patent laws of the United States. Subject matter jurisdiction over this action exists pursuant to 28 U.S.C. §§ 1331, 1338, and 2201-2202.

4.      Upon information and belief, this Court has personal jurisdiction over Vygon because it has established minimum contacts with the forum. Upon information and belief, Vygon manufactures products that are and have been used, offered for sale,

sold, and purchased in Tennessee, including in this District. Upon information and belief, Vygon, either directly and/or through its distribution network, places its products within the stream of commerce, which stream is directed at this District. As such, Vygon has purposefully availed itself of the privileges and benefits of the laws of the State of Tennessee, and the exercise of jurisdiction over Vygon would not offend traditional notions of fair play and substantial justice.

## VENUE

5.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and (d) because upon information and belief, Vygon is an alien, resides in this District, may be found in this District, is subject to personal jurisdiction in this District, and a substantial part of the events, omissions, and injuries giving arise to RyMed's claims occurred in this District.

## FACTUAL ALLEGATIONS

6.     RyMed specializes in the design, development, and marketing of innovative safety products in the field of intravenous catheter care management.

7.     RyMed created the InVision-Plus® NEUTRAL® I.V. Connector System, which is designed to prevent blood reflux into a catheter lumen when the InVision-Plus® NEUTRAL® is connected to and disconnected from a syringe and/or I.V. set. This product reduces the possibility of intraluminal thrombotic catheter occlusions, as well as reduces the possibility of intraluminal catheter-related bloodstream infections.

8.     RyMed has also designed and created a new product, the InVision-Plus® NEUTRAL® with Modified Boot. RyMed has taken concrete steps with the intent to manufacture, sell, and offer to sell in the United States the InVision-Plus® NEUTRAL® with Modified Boot. These steps include:

a.     The completion of all engineering design drawings for the new modified boot;

2

b.    The completion of all engineering functional testing on the new modified boot;

c.    The completion of all sterilization testing on the new modified boot;

d.    The development of a large captivation production mold of the new modified boot design schedule for completion in the late fourth quarter of 2007; and

e.    The preparation of sales and marketing literature for the new modified boot design;

RyMed expects to offer the InVision-Plus® NEUTRAL® with Modified Boot for sale in the first quarter of 2008.

9.    Upon information and belief, Vygon is the owner of the entire right, title, and interest in and to United States Patent No. 5,380,306 ("the '306 patent") entitled "Unitary Composite Connector For A Liquid Circuit, In Particular For Medical Applications." A true and correct copy of the '306 patent is attached hereto as Exhibit **A** to this Complaint.

10.    On September 17, 2007, Vygon's counsel sent a letter to RyMed, alleging that RyMed's InVision-Plus® NEUTRAL® I.V. Connector System (incorrectly identified in the letter as the Invision-Plus Neutral Displacement I.V. Connector System), and possibly other products, infringe the '306 patent. Vygon asked RyMed to cease and desist its alleged infringement of the '306 patent, "including, without limitation, the manufacture, use, offer for sale, and sale of RyMed's [InVision-Plus® NEUTRAL® I.V. Connector System] and all other infringing systems and components." Vygon then informed RyMed that "[r]emedies for patent infringement in an action at law include an award of damages and an injunction. Infringing acts committed after the notice given by this correspondence will be willful and may result in an award of increased damages and

3

attorneys fees." A true and correct copy of the September 17, 2007 letter from Vygon to RyMed is attached hereto as Exhibit **B** to this Complaint.

11.     On October 16, 2007, RyMed's counsel contacted Vygon's counsel via email to further discuss the issue, but in an email dated October 18, 2007, Vygon's counsel reiterated its demand that RyMed cease and desist its alleged patent infringement. In addition, Vygon's counsel stated that "Vygon does not wish to pursue a business arrangement with RyMed or deal with RyMed other than through counsel." A true and correct copy of the October 16, 2007 email from Rymed's counsel to Vygon's counsel and the October 18, 2007 email from Vygon's counsel in response are attached hereto as Exhibit **C** to this Complaint.

12.     Accordingly, RyMed is in the position of either continuing to manufacture, offer to sell, and sell the InVision-Plus® NEUTRAL® I.V. Connector System in the United States under apprehension of suit by Vygon, or abandoning its efforts. As described above, RyMed has also taken ongoing concrete steps with the intent to manufacture, offer to sell and sell in the United States the InVision-Plus NEUTRAL® with Modified Boot. RyMed intends to begin offering the InVision-Plus NEUTRAL® with Modified Boot for sale in the first quarter of 2008. As such, RyMed is in the position of either continuing to pursue its plans with respect to manufacturing, offering to sell, and selling the InVision-Plus® NEUTRAL® with Modified Boot in the United States under apprehension of suit by Vygon, or abandoning its efforts.

13.     This is an actual and justiciable controversy of sufficient immediacy and reality between parties having adverse legal interests to warrant the issuance of a declaratory judgment.

## COUNT ONE

### DECLARATORY JUDGMENT OF
### NON-INFRINGEMENT OF THE '306 PATENT

14.     RyMed realleges and incorporates herein by reference the matters alleged in Paragraphs 1 through 13 of this Complaint.

15.     An actual and justiciable controversy exists between RyMed and Vygon as to RyMed's non-infringement of the '306 patent.

16.     RyMed has not infringed and does not infringe any valid and enforceable claim of the '306 patent, either directly, indirectly, literally, or under the doctrine of equivalents.

17.     RyMed has no adequate remedy at law.  The actions and assertions made by Vygon regarding the infringement of the '306 patent have caused, and if not enjoined, will continue to cause, irreparable injury to RyMed.

### COUNT TWO

### DECLARATORY JUDGMENT OF INVALIDITY OF THE '306 PATENT

18.     RyMed realleges and incorporates herein by reference the matters alleged in Paragraphs 1 through 17 of this Complaint.

19.     An actual and justiciable controversy exists between RyMed and Vygon as to the invalidity of the '306 patent.

20.     The claims of the '306 patent are invalid and unenforceable for failure to meet one or more of the requirements of patentability specified in Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 102, 103 and/or 112.

21.     RyMed has no adequate remedy at law.  The actions and assertions made by Vygon regarding infringement of the '306 patent have caused, and if not enjoined, will continue to cause, irreparable injury to RyMed.

5

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff RyMed hereby demands a trial by jury of this action.

## REQUESTED RELIEF

WHEREFORE, RyMed prays for judgment and seeks relief against Vygon as follows:

a.    A judgment declaring that RyMed has not and does not infringe any valid and enforceable claim of the '306 patent, either directly or indirectly, and either literally or under the doctrine of equivalents.

b.    A judgment declaring that each and every claim of the '306 patent is invalid and/or unenforceable.

c.    A judgment declaring this case to be an exceptional case within the meaning of 35 U.S.C. § 285, and awarding RyMed its attorneys' fees, costs, and expenses incurred in this action as permitted by law; and

d.    Such other and further relief as the Court may deem just and proper.

Dated: October 31, 2007

Respectfully submitted,

NEAL & HARWELL, PLC

By: /s/ W. David Bridgers

150 Fourth Avenue North
Suite 2000
Nashville, TN  37219
(615) 244-1713

Counsel for Plaintiff

6

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
VYGON

(b)  County Of Residence Of First Listed Plaintiff:
     (Except In U.S. Plaintiff Cases)

(c)  Attorneys (Firm Name, Address, And Telephone Number)

Josy W. Ingersoll, Esquire
John W. Shaw, Esquire
Adam W. Poff, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 West Street,
Wilmington, DE 19801
(302) 571-6600

## DEFENDANT
RYMED TECHNOLOGIES, INC.

County Of Residence Of First Listed Defendant:
     (IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
       TRACT OF LAND INVOLVED

Attorneys (If Known)

## II. BASIS OF JURISDICTION    (PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government
    Plaintiff

☐ 2 U.S. Government
    Defendant

☒ 3 Federal Question
    (U.S. Government Not a Party)

☐ 4 Diversity
    (Indicate Citizenship of
    Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place An X In One Box For Plaintiff And
(For Diversity Cases Only)       One Box For Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in This State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## V. NATURE OF SUIT    (Place An X In One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 U.S.C. 881<br>☐ 630 Liquor Laws<br>☐ 640 R R & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 U.S.C. 158<br>☐ 423 Withdrawal 28 U.S.C. 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☒ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates, etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 U.S.C. 3410<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br><br>**PERSONAL ROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl Ret Inc Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS - Third Party 26 U.S.C. 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |
|  | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>Habeas Corpus<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition |  |  |  |

## IV. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding    ☐ 2 Removed from Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.):
35 U.S.C. § 1 et seq.

Brief description of cause:
Cause of action for patent infringement.

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

CLASS ACTION  YES  NO

DEMAND $

Check YES only if demanded in complaint
JURY DEMAND: ☐ YES ☒NO

## VIII. RELATED CASE(S) IF ANY (See instructions)
JUDGE:                           DOCKET NUMBER:

DATE
March 26, 2008

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44**

Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.    (a)    **Plaintiffs - Defendants**. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)    **County of Residence**. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved).

(c)    **Attorneys**. Enter firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II.    **Jurisdiction**. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction is based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.    **Residence (citizenship) of Principal Parties**. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.    **Cause of Action**. Report the civil statute directly related to the cause of action and give a brief description of the cause.

V.    **Nature of Suit**. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI.    **Origin**. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate's decision.

VII.    **Requested in Complaint**. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    **Related Cases**. This section of the JS-44 is used to reference relating pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**. Date and sign the civil cover sheet.